# EXHIBIT 1

**FOSTER LAW OFFICES, LLC**
JEFFREY E. FOSTER #9857
PO Box 127
Captain Cook, HI 96704
Tel: (808) 348-7800
Fax: (808) 443-0277

Attorney for Plaintiff

**Electronically Filed
SECOND CIRCUIT
2CCV-23-0000239
24-AUG-2023
01:59 PM
Dkt. 2 CMPS**

**IN THE CIRCUIT COURT OF THE SECOND CIRCUIT
STATE OF HAWAII**

| | |
|---|---|
| JACK GRUMET, a Maui resident,<br><br>BRIGGS MOUNTAIN PROPERTIES, LLC,<br>a New York Limited Liability Company,<br><br>             Plaintiffs,<br>V.<br><br>MAUI ELECTRIC COMPANY, LIMITED, a<br>Hawaiʻi corporation; HAWAIIAN<br>ELECTRIC INDUSTRIES, INC., a Hawaiʻi<br>Corporation; HAWAII ELECTRIC<br>COMPANY INC., a Hawaiʻi corporation;<br>HAWAII ELECTRIC LIGHT COMPANY,<br>INC., a Hawaiʻi corporation; JOHN DOES 1-<br>10; DOE CORPORATIONS 1-10; DOE<br>PARTNERSHIPS 1-10; DOE ENTITIES 1-<br>10, and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>             Defendants, | ) CIVIL NO.<br>) (Non-Motor Vehicle Tort)<br>)<br>)<br>)<br>) **COMPLAINT; DEMAND FOR JURY**<br>) **TRIAL; SUMMONS**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## COMPLAINT

    Plaintiffs JACK GRUMET and BRIGGS MOUNTAIN PROPERTIES, LLC complain of

Defendants as follows.

### INTRODUCTION

    1.    Defendants, Maui Electric Company, Limited ("MECO"); Hawaiian Electric

Industries, Inc. ("HEI"); Hawaiian Electric Company, Inc. ("HECO"); and Hawaii Electric Light Company, Inc. ("HELCO"), caused a devastating wildfire on August 8, 2023, in the town of Lahaina, Maui County, Hawai'i. The Lahaina Wildfire was, by far, the deadliest wildfire in the United States in over a century,[1] and it destroyed or damaged more than 2,200 structures across 2,170 acres.[2] Rebuilding could cost over $5.5 billion according to preliminary assessments.[3]

2.      Defendants knew of the risk of fire. Nevertheless, they put profits over people. Among other negligent acts—including failure to maintain equipment and trim vegetation—Defendants kept their power lines energized during forecasted high fire danger conditions.

3.      HEI, the parent corporation to HECO, MECO, and HELCO, had a market cap valuation of $3.55 billion as of August 11, 2023.

4.      The pictures below show Lahaina before and after the fire:



---

[1] Bill Hutchinson, *Maui wildfire now ranks as the fifth-deadliest in US history*, ABCNEWS (Aug. 21, 2023), https://www.history.com/news/deadliest-wildfires-north-america

[2] James Leggate, *Estimate Tops $5.5B for Cost of Rebuilding After Maui Fires*, ENRCALIFORNIA (Aug. 14, 2023), https://www.enr.com/articles/56940-estimate-tops-55b-for-cost-of-rebuilding-after-maui-fires.

[3] Aya Elamroussi, *Firefighters make progress against deadly wildfires in Maui, as officials estimate it will cost billions of dollars to rebuild*, CNN (Aug. 12, 2023), https://www.cnn.com/2023/08/12/us/maui-wildfires-hurricane-dora-saturday/index.html.

## PARTIES, JURISDICTION AND VENUE

5.      Plaintiff JACK GRUMET was, at all relevant times, a resident of Makawao, Maui County, Hawaiʻi. He owned real estate at 597 Prison St. Lahaina, HI 96761-1210, which the Lahaina Wildfire destroyed completely. His claims for relief arose in Maui County, Hawaiʻi.

6.      Plaintiff BRIGGS MOUNTAIN PROPERTIES, LLC is a New York limited liability company registered in Hawaiʻi and owned by Mr. Grumet, which held record title to 597 Prison St. Lahaina, HI 96761-1210. Its claims for relief arose in Maui County, Hawaiʻi.

7.      On information and belief, Defendant MAUI ELECTRIC COMPANY, LIMITED is a Hawaiʻi for-profit corporation that generates and sells electricity in Maui County, Hawaiʻi.

8.      On information and belief, Defendant HAWAIIAN ELECTRIC INDUSTRIES, INC. is a Hawaiʻi for-profit corporation that serves as a holding company for one or more of the above-captioned defendants.

9.      On information and belief, Defendant HAWAIIAN ELECTRIC COMPANY INC. is a Hawaiʻi for-profit corporation first registered to do business in Hawaiʻi in 1891 that generates and sells electricity in Hawaiʻi.

10.     On information and belief, Defendant HAWAII ELECTRIC LIGHT COMPANY INC. is a Hawaiʻi for-profit corporation first registered to do business in Hawaiʻi in 1894 that generates, purchases, and distributes electricity in Hawaiʻi.

11.     The true name and capacities, whether individual or otherwise, of defendants JOHN DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, DOE ENTITIES 1-10, and DOE GOVERNMENTAL AGENCIES 1-10, and each of them, are unknown to Plaintiff, who therefore sues those Defendants by fictitious names. Plaintiff is informed and believes and thereon alleges that Defendants designated as JOHN DOES 1-10, DOE CORPORATIONS 1-10, DOE

PARTNERSHIPS 1-10, DOE ENTITIES 1-10, and DOE GOVERNMENTAL AGENCIES 1-10, inclusive, and each of them, are negligently or otherwise responsible in some way or ways for the accident, events, happenings, and occurrences herein referred to as herein alleged.

12.    Plaintiffs' claims for relief arose in the County of Maui, State of Hawai'i and are within the jurisdiction of this Court under HRS §§ 603-21.5 and 634-35.

13.    Venue is proper under HRS § 603-36(5), as all acts alleged arose in the County of Maui, State of Hawai'i and all defendants are Hawai'i corporations.

## FACTS

14.    On information and belief, the Maui wildfires in Lahaina originated near the entrance of the Lahaina Substation located on Lahainaluna Road. Hawaiian Electric owns the Lahaina Substation. On information and belief, the Lahaina Substation was identified as being near capacity in 2011.



**The Lahaina Substation is the gray rectangular area located at the end of the dark brown fire trail just south and makai of the Lahainaluna football field.**

15.    In 2014, the Hawaii Wildfire Management Organization issued a wildfire mitigation plan that warned Lahaina was among Maui's most fire-prone areas based on its

4

proximity to grasslands, steep terrain, and frequent winds and outlined a plan for working with utilities to help reduce the risk of fires.[4]

16.    On August 6, 2023, the National Weather Service in Honolulu issued a "fire weather watch" for the state. It warned that "[s]trong and gusty winds, combined with low humidities ... may lead to critical fire conditions across leeward areas over the coming days."

17.    On August 7, 2023, the National Weather Service issued a High Wind Warning and "Red Flag Warning." According to the National Weather Service, a "Red Flag Warning" means "warm temperatures, very low humidities and stronger winds are expected to combine to produce an increased risk of fire danger."

18.    According to the National Weather Service, winds on August 8, 2023, were blowing in a westerly direction (mauka to makai).

19.    By 5:10 am on August 8, 2023, Hawaiian Electric knew of a power outage in West Maui. Below is a notification from Hawaiian Electric to its customers.



_____

[4] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL STREET JOURNAL, (Aug. 11. 2023), https://on.wsj.com/45xDAv8.

20.    Approximately 6:30 am a "brush fire" was reported on Lahainaluna Road. Power lines can be observed hanging from poles in the area around the fire.



21.    Throughout the day, Hawaiian Electric tweeted photos of several downed power lines. According to Hawaiian Electric, there were "about 30 downed poles and multiple spans of power lines" in the Lahaina area. On information and belief, numerous downed lines remained "live" after falling.

22.    The first report of a downed Maui Electric power pole power comes from Maui County in a post on the social media website Twitter (now known as "X") at 6:38 am. The post states: "ROAD CLOSURE: Honoapiilani Hwy between Front St. and Hokiokio Road due to down Meco poles on the road."

23.    Around that time, a witness, Shane Treu, described to the *New York Times* what happened: "The wind is still blowing super strong and I hear a pop," Mr. Treu said, "I look and the line is just arcing, laying on the ground and sparking."[5]  The power line, landing in dry grass, was "like a fuse," he said. According to the *New York Times*, "It was precisely the location where

---

[5] Nicholas Bogel-Burroughs, et al., *How Fire Turned Lahaina Into a Death Trap*, NY Times (Aug. 15, 2023), https://bit.ly/3P78NAb.

the brush fire that would eventually engulf much of Lahaina was initially reported, at 6:37 a.m.,

a Times analysis of video and satellite imagery shows."[6]

24.     A still from a video taken by Mr. Treu shows the fire around 6:40 am.



25.     At 6:42 am, Hawaiian Electric announced a power outage impacting 1,000

customers in and around Lahainaluna Road.



---

[6] *Id.*

26.     At 8:27 am, the County of Maui posted on Twitter that more MECO power poles were down. The Tweet states as follows: "ROAD CLOSURE UPDATE: Honoapiilani Hwy between Aholo Rd. and Hokiokio Road due down Meco poles."

27.     County officials asserted that the fire was "100% contained" by 9 am.

28.     In a County of Maui press release issued at 9:55 am, the County notified residents of downed power lines. The press release states as follows: "Lahainaluna Road remains closed between Kelawea and Kuialua streets while Hawaiian Electric responds to a downed power line in the area."

29.     By the afternoon, the fire flared up again dramatically. A survivor, Denton Fuqua, recounted the scene to the *New York Times*: "We were with a bunch of people praying — kids were crying. … People were letting their pets go because they couldn't carry them and cover their mouths. … It was like a flamethrower on the town," she said. "It was as if some person or mythical thing had a blowtorch and was just taking it to our whole entire town."[7]

30.     In a County of Maui press release issued around 6 pm, the County identified more downed power lines. The press release states: "Honoapiilani Highway from Hokiokio Place to Lahaina Bypass was reopened at about 5 pm, following the clearing of downed power lines."

31.     In a County of Maui press release around 10:30 pm, the County issued an advisory from Hawaiian Electric. The press release states as follows: "Hawaiian Electric Co. advises residents to stay at least 30 feet or more away from downed power lines, which may be energized. Downed power lines can be reported to 911 or Hawaiian Electric's trouble line…"

---

[7] Bogel-Burroughs, *supra* n. 5, https://bit.ly/3P78NAb.



Downed power lines at Kapunakea Street and Honoapiilani Hwy - Photo credit Washington Post

32.    On information and belief, Defendants did not deploy a "public power shutoff plan." This involves cutting off electricity to areas where big wind events could spark fires.

33.    On information and belief, Defendants knew that a "public power shutoff plan" was an effective strategy but decided not to adopt it as part of fire mitigation plans.

34.    For example, according to the *Washington Post*, Defendants were "aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to [HEI] and two former power and energy officials" the *Post* interviewed. Defendants knew shutting off power is "a successful way to prevent wildfires when additional robust techniques are not in place."[8]

35.    Former Maui County energy commissioner Doug McLeod allegedly confirmed that

---

[8] Brianna Sacks, *Hawaii utility faces scrutiny for not cutting power to reduce fire risks*, WASH. POST (Aug. 12, 2023), https://bit.ly/47IjVe4.

9

Hawaiian Electric was aware of the need for a regular shut-down system and to bury lines, given the "number of close calls in the past."

36.     On information and belief, Defendants maintained the ability to shut off the power on its own but decided against doing so. In support of this decision, Hawaiian Electric spokesperson Darren Pai emailed a San Francisco Chronicle reporter stating as follows:

> Preemptive, short-notice power shutoffs have to be coordinated with first responders, and in Lahaina, electricity powers the pumps that provide the water needed for firefighting. Notifications also need to be made to customers with special medical needs who use specialized equipment.

37.     On information and belief, Hawaiian Electric confirmed that it does not have a "formal power shutoff" protocol. In a 2022 filing, however, Hawaiian Electric identified California's Public Power Shutoff plan as a way to prevent wildfires.

38.     In apparent acknowledgement of extreme weather dangers on August 8, 2023, Hawaiian Electric spokesperson, Darren Lai further stated that Hawaiian Electric did in fact deactivate devices on some power lines known as reclosers before the onset of high winds. A recloser is an automatic, high voltage electrical switch that shuts off, then restores electrical power to an electrical line if it determines the problem is temporary.

39.     In an interview with *NPR*, Jennifer Potter, a former member of the Hawai'i Public Utilities Commission, said: "The infrastructure in West Maui is very old. I mean, some of those substations are over 70 years old, and they're certainly not as reliable and as effective and maybe even as durable as we would like to see in these kind of storm conditions."[9]

40.     On a web page entitled "Resilience," Hawaiian Electric actually acknowledges the

---

[9] Lauren Sommer, *People are mobilizing to help Maui fire survivors*, NPR (Aug. 12, 2023), https://bit.ly/3smUWwJ.

need to "strengthen the most critical transmission lines to withstand extreme winds." It also states a need to "strengthen lines and deploy devices to prevent and respond to wildfires." The webpage also states that Hawaiian Electric is "replacing more than 400 poles on Maui, Lanai and Molokai to maintain strength and safety standards based on inspections and testing" and "installing weather stations at targeted West Maui facilities to actively assess drier and hotter weather patterns contributing to longer wildfire seasons produced by climate change."

41.     On information and belief, Defendants' action or culpable inaction caused the Lahaina Wildfire.

42.     To date, the Lahaina Wildfire has resulted in a devastating loss of human life and has destroyed over 2,200 structures, including Plaintiffs' real property, which was a long-term rental investment property that could house eight tenants. Income from the house helped fund Mr. Grumet's retirement.

43.     The Lahaina Wildfire caused Plaintiffs to suffer substantial harms, including damage to or destruction of real property; damage to or loss of personal property; out-of-pocket expenses directly and proximately incurred because of the fire; and various types of emotional distress, annoyance, inconvenience, disturbance, and mental anguish. The harms caused by the Defendants are extensive and ongoing, as can be seen in the pictures below, showing Plaintiff's property before and after the fire:



**CAUSES OF ACTION**

**COUNT I – INVERSE CONDEMNATION**

44.     Plaintiffs allege all previous paragraphs as if set forth here at length.

45.     Plaintiffs are property owners affected by the Lahaina Wildfire.

46.     The Hawai'i Constitution, Article I, Section 20 provides, "Private property shall not be taken or damaged for public use without just compensation."

47.     Under HRS § 269-1, Defendants are a public utility.

48.     Defendants designed, installed, owned, operated, used, controlled, managed, and/or maintained overhead electrical infrastructure in Hawai'i for the purpose of providing electricity to the public for public use. Accordingly, Defendants operate as a public utility.

49.     HRS § 101-4 gives Defendants, as operators of a public utility, "[t]he right and power of eminent domain."

50.     Defendants intentionally undertook the actions and inaction described above, including failing to clear vegetation, failing to maintain their equipment, failing to use firesafe equipment during high-risk fire conditions, failing to plan to deenergize power lines during a High Wind Watch or Red Flag Warning, and failing to shut off the power during those conditions.

51.     Defendants' negligent and reckless operation of its overhead electrical infrastructure necessarily caused the Lahaina Wildfire, which destroyed real and personal property belonging to Plaintiffs. Defendants also interfered, and substantially interfered, with the use, access, enjoyment, value, and marketability of Plaintiffs' property.

52.     Thus, Defendants have taken private property from Plaintiffs without adequate or just compensation.

53.     The damage to Plaintiffs was the necessary, certain, predictable, or inevitable result

of Defendants' actions.

54.      The damage to Plaintiffs outweighs the risk and harm from the improvements Defendants undertook to provide electricity to the public.

55.      Justice, fairness, and the Hawaiʻi Constitution require that Defendants compensate Plaintiffs for the taking of their property and their injuries.

56.      As a result of the foregoing, Plaintiffs suffered damages in an amount to be proven at trial.

57.      As set forth above, Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs, subjecting Defendants to awards of punitive damages.

## COUNT II – TRESPASS

58.      Plaintiffs allege all previous paragraphs as if set forth here at length.

59.      Plaintiffs owned real properties in the area the Lahaina Wildfire occurred.

60.      Defendants negligently or recklessly allowed the Lahaina Wildfire to ignite and/or spread out of control, which caused damage to Plaintiffs' properties.

61.      Defendants were engaged in an abnormally dangerous activity.

62.      Plaintiffs, of course, did not grant permission for fire to be on their property.

63.      This trespass was a substantial factor in causing Plaintiffs to suffer damages including, but not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property and cherished possessions, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, and emotional distress. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

64.    Defendants, including Defendants' officers, directors, or managers, have deliberately, and repeatedly, prioritized profits over safety. That is, Defendants have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Lahaina Wildfire. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of prioritizing profits over safety and to deter such conduct in the future.

### COUNT III – NUISANCE

65.    Plaintiffs allege all previous paragraphs as if set forth here at length.

66.    Plaintiffs owned real properties in the area the Lahaina Wildfire occurred.

67.    Defendants' actions and inactions created a condition and/or permitted a condition to exist that was harmful to health; offensive to the senses; rendered the ordinary use of physical occupation uncomfortable; caused an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner, of public streets and highways; and a completely predictable fire hazard.

68.    These conditions interfered with Plaintiffs' quiet enjoyment of their properties in a way unique to each of Plaintiffs.

69.    These conditions also affected a substantial number of people at the same time.

70.    At no time did Plaintiffs consent to Defendants' actions and inactions in creating these conditions.

71.    An ordinary person would be reasonably annoyed and disturbed by Defendants' actions and inactions in creating these conditions.

72.     Defendants' wrongful and unlawful actions and inactions in creating these conditions were a substantial factor in causing Plaintiffs to suffer damages unique to each plaintiff (and different from damages suffered by other plaintiffs) including, but not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property, discomfort, annoyance, inconvenience, mental anguish, and emotional distress. Plaintiffs each seek damages to be determined according to proof at trial.

73.     The seriousness of the harm Defendants have caused Plaintiffs outweighs any public benefit that Defendants may provide.

74.     Defendants, including Defendants' officers, directors, or managers, have deliberately, and repeatedly, prioritized profits over safety. That is, Defendants have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Lahaina Wildfire. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of prioritizing profits over safety and to deter such conduct in the future.

## COUNT IV – GROSS NEGLIGENCE, NEGLIGENCE, AND NEGLIGENCE PER SE

75.     Plaintiffs allege all previous paragraphs as if set forth here at length.

76.     Defendants each have special knowledge and expertise far beyond that of a layperson regarding the safe design, engineering, construction, use, operation, inspection, repair, and maintenance of the electrical lines, infrastructure, equipment, and vegetation management efforts. The provision of electrical services involves a peculiar and inherent risk of wildfires.

77.     Before and on August 8, 2023, Defendants had a non-delegable duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in designing, engineering,

constructing, operating, and maintaining electrical transmission and distribution systems. This duty also required Defendants to maintain appropriate vegetation management programs, for the control of vegetation surrounding their exposed power lines. This duty also required Defendants to consider the changing conditions relevant to their electrical transmission and distribution systems, as well as changing geographic, weather, and ecological conditions. This duty also required Defendants to take special precautions to protect adjoining properties from wildfires caused by their electrical equipment.

78.    Defendants each breached these duties by, among other things:

a.   Failing to design, construct, operate, and maintain their high-voltage transmission and distribution lines and associated equipment, in a way that would withstand the foreseeable risk of wildfires and wind in the area of the Lahaina Wildfire;

b.   Failing to prevent electrical transmission and distribution lines from improperly falling, sagging, or making contact with other metal;

c.   Failing to properly inspect and maintain vegetation within proximity to energized transmission and distribution lines to mitigate the risk of fire;

d.   Failing to conduct reasonably prompt, proper, and frequent inspections of their power lines and associated equipment;

e.   Failing to promptly de-energize exposed power lines during fire-prone conditions, which they knew was an effective fire prevention strategy;

f.   Failing to properly train and supervise employees and agents responsible for maintenance and inspection of power lines; and

g. Failing to implement and follow regulations and reasonably prudent practices to avoid fire ignition.

79.     Defendants had a reckless and conscious indifference to the consequences that could arise from their actions and inactions, so they were grossly negligent.

80.     Under HRS § 269-1, Defendants are a public utility.

81.     Under HRS § 269-6(a), the public utilities commission has general supervision "over all public utilities, and shall perform the duties and exercise the powers imposed or conferred upon it by this chapter. Included among the general powers of the commission is the authority to adopt rules pursuant to chapter 91 necessary for the purposes of this chapter." The public utilities commission has adopted such rules pursuant to chapter 91.

82.     On March 8, 2007, the public utilities commission adopted Chapter 6-73 of the Hawaiʻi Administrative Rules (HAR), "Installation, Operation, and Maintenance of Overhead and Underground Electrical Supply and Communication Lines." HAR § 6-73-11 provides:

> (a) The commission finds that the National Electrical Safety Code represents the current, up-to-date, expert, and industry-accepted standards for the installation, operation, and maintenance of overhead and underground electrical supply and communication lines, and that it is appropriate to use these standards regarding public utility service in the State.
>
> (b) Accordingly, the commission adopts and incorporates by reference the 2002 edition of the National Electrical Safety Code, as it pertains to the installation, operation, and maintenance of overhead and underground electrical supply and communication lines, as part of this chapter.

83.     Defendants violated several provisions of the 2002 edition of the National Electrical Safety Code®, as it pertains to the installation, operation, and maintenance of overhead and underground electrical supply and communication lines. Such violations constitute negligence per se, because Hawaiʻi law has specifically adopted the code as a Hawaiʻi regulation.

84.    For instance, in violation of § 214 of the 2002 edition of the National Electrical Safety Code®, Defendants failed to adequately install, inspect, test, record defects, and remedy defects in their electrical lines and equipment. In further violation of § 214, Defendants failed to maintain lines that were "temporarily out of service … in a safe condition."

85.    In violation of § 217 of the 2002 edition of the National Electrical Safety Code®, Defendants failed to place supporting structures for overhead lines "so as to be exposed as little as is practical to brush, grass, rubbish, or building fires."

86.    In violation of § 218 of the 2002 edition of the National Electrical Safety Code®, Defendants failed to trim trees adequately. The code notes that "normal tree growth, the combined movement of trees and conductors under adverse weather conditions, voltage, and sagging of conductors at elevated temperatures are among the factors to be considered in determining the extent of trimming required." Defendant also failed to provide adequate clearance in accordance with the code.

87.    In violation of §§ 260-64 of the 2002 edition of the National Electrical Safety Code®, Defendants did not make their lines and equipment strong enough.

88.    In violation of §§ 270-79 of the 2002 edition of the National Electrical Safety Code®, Defendants did not adequately insulate their supply lines.

89.    Defendants' negligence and gross negligence, including Defendants' negligence per se, was a substantial factor in causing Plaintiffs to suffer damages including, but not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property, discomfort, annoyance, inconvenience, mental anguish, and emotional distress. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

90.    Defendants, including Defendants' officers, directors, or managers, have deliberately, and repeatedly, prioritized profits over safety. That is, Defendants have a history of acting recklessly and with conscious disregard to human life and safety, and this history of recklessness and conscious disregard was a substantial factor in bringing about the Lahaina Wildfire. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of prioritizing profits over safety and to deter such conduct in the future.

## CONCLUSION AND PRAYER

91.    WHEREFORE, Plaintiffs pray for judgment against Defendants and such other defendants as may be added to this Complaint, as follows:

(1) For special damages in an amount to be determined at trial or hearing hereof;

(2) For general damages in an amount to be determined at trial or hearing hereof;

(3) Punitive damages; and

(4) For such other or further amounts and relief as the court deems just and equitable, together with Plaintiff's costs, prejudgment interest pursuant to HRS §636-16, and post-judgment interest pursuant to HRS §478-3, thereon.

## <u>JURY DEMAND</u>

Plaintiffs respectfully pray for a trial by jury of all claims.

DATED: Kailua Kona, Hawai'i, August 24, 2023.


/s/Jeffrey E. Foster
JEFFREY E. FOSTER
Attorney for Plaintiff

| **STATE OF HAWAI'I**<br>**CIRCUIT COURT OF THE**<br>**SECOND** ▼ **CIRCUIT** | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | |
|---|---|---|
| **CASE NUMBER**<br><br><br>**PLAINTIFF**<br>JACK GRUMET; BRIGGS MOUNTAIN PROPERTIES, LLC | **PLAINTIFF'S NAME & ADDRESS, TEL. NO.**<br>JACK GRUMET; BRIGGS MOUNTAIN PROPERTIES, LLC<br>c/o Jeffrey E. Foster, Esq.<br>Foster Law Offices, LLC<br>P.O. Box 127<br>Captain Cook, HI 96704<br>(808) 348-7800 | |
| **DEFENDANT(S)**<br>MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC INDUSTRIES, INC.; HAWAII ELECTRIC COMPANY INC.; HAWAII ELECTRIC LIGHT COMPANY, INC. | | |

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon

Jeffrey E. Foster, Esq., Foster Law Offices, LLC, P.O. Box 127, Captain Cook, HI 96704

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

DATE ISSUED    August 24, 2023

Effective Date of 07-Oct-2019
Signed by: /s/ D. Pellazar Clerk,
2nd Circuit, State of Hawai`i



 In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Second Circuit Court Administration Office at PHONE NO. 244-2800, FAX 244-2849, at least ten (10) working days prior to your hearing or appointment date

Form CC-CV-DIV-???